**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BRICE VAN ELSWYK, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:15–cv–1844 (JCH) |
| v. | : | |
| | : | AUGUST 9, 2017 |
| RBS SECURITIES, INC., | : | |
| Defendant. | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (DOC. NO. 44)**

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 2

II.  FACTS ..................................................................................................................... 3

   A.  Van Elswyk's Employment at RBS ..................................................................... 3

   B.  The Ritchie Portfolio: Assets and Accounting .................................................... 7

   C.  Van Elswyk's Allegedly Protected Activities ...................................................... 9

   D.  Procedural History ............................................................................................ 16

III. LEGAL STANDARDS ............................................................................................ 16

   A.  Motions for Summary Judgment ....................................................................... 16

   B.  Sarbanes-Oxley and Dodd-Frank ..................................................................... 17

IV.  DISCUSSION ......................................................................................................... 18

   A.  Protected Activity ............................................................................................. 19

      1.  Subjectively Genuine Belief of SOX-Enumerated Violations ........................... 20

      2.  Objectively Reasonable Belief of SOX-Enumerated Violations ....................... 21

      3.  Provision of Information Regarding SOX-Enumerated Violations .................... 25

   B.  Knowledge of the Protected Activity ................................................................. 28

   C.  Protected Activity as a Contributing Factor in an Adverse Personnel Action ....... 29

   D.  Evidence that Termination Would have Occurred in the Absence of Protected
       Activity ............................................................................................................. 32

V.   CONCLUSION ....................................................................................................... 33

## I.    INTRODUCTION

Plaintiff Brice Van Elswyk ("Van Elswyk") instituted this action in late 2015 against defendant RBS Securities, Inc. ("RBS").  See Compl. (Doc. No. 1) at 1.  Van Elswyk claims that RBS violated whistleblower provisions in the Sarbanes-Oxley ("SOX") and Dodd-Frank Wall Street Reform and Consumer Protection ("Dodd-Frank") Acts, when RBS fired Van Elswyk in February 2012.  See generally Compl. at 7–9 ¶¶ 29–43 (citing 18 U.S.C. § 1514A and 15 U.S.C. § 78u-6).  Specifically, Van Elswyk alleges that his employment was terminated at least in part because he engaged in protected activity within the meaning of SOX and Dodd-Frank, when he expressed concern regarding the accounting practices and valuation methodologies RBS applied to certain life-insurance-based financial assets.  See id.  Van Elswyk primarily demands money damages.  See id. at 9.

Following discovery, RBS filed a Motion for Summary Judgment, see generally Notice of Mot. for Mot. for Summ. J. [sic] ("Motion") (Doc. No. 44),[1] accompanied by a Memorandum of Law, see generally Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Mem. in Supp.") (Doc. No. 44-1), and a Local Rule 56(a)1 Statement, see generally Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Def.'s L.R. 56(a)1") (Doc. No. 44-2).  That Motion is now pending.  Van Elswyk opposes the

---

[1] Confusingly, RBS's Motion is titled "Notice" and purports to notify the court of its intent to "move [the] court, at a time and date to be determined by the [c]ourt, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting Defendant's motion for summary judgment and dismissing this action in its entirety."  See Motion at 1.  RBS's filings are clearly, in substance, a Motion for Summary Judgment and the required, accompanying documents.  The parties have treated the filing at Docket Number 44 as a full-fledged Motion for Summary Judgment—notwithstanding the suggestion in the "Notice" that RBS would so move at a later date—and the court will as well.

The court believes this "Notice" practice exists in the United States District Court for the Southern District of New York.  There is nothing in the Federal Rules of Civil Procedure or in the District of Connecticut Local Rules that provides for such a practice or filing.

Motion, see generally Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Mem. in Opp'n") (Doc. No. 48), and has filed his responsive Local Rule 56(a)2 Statement, see generally Pl.'s Local Rule 56(a)(2) Statement in Opp'n to Defs.' [sic] Mot. for Summ. J. ("Pl.'s L.R. 56(a)2") (Doc. No. 49). RBS replied in a timely manner. See generally Reply Mem. of Law in Further Supp. of Def.'s Mot. for Summ. J. ("Reply") (Doc. No. 54).

For the reasons set forth below, RBS's Motion for Summary Judgment (Doc. No. 44) is **DENIED**.

## II.    FACTS

### A.    Van Elswyk's Employment at RBS

In March 2011, RBS hired Van Elswyk to work in its Stamford, Connecticut office. Def.'s L.R. 56(a)1 at 1 ¶ 2; Pl.'s L.R. 56(a)2 at 1 ¶ 2. He was hired as a Managing Director and Head of North American Insurance Structuring, responsible for increasing RBS's product offerings to insurance companies and for generating revenue derived from products involving life insurance or property and casualty insurance. Def.'s L.R. 56(a)1 at 1–2 ¶ 3; Pl.'s L.R. 56(a)2 at 1 ¶ 3. Before joining RBS, Van Elswyk had worked in financial areas including complex asset structuring with regulated entities, marketing structured products, and cross-border tax transactions. See Def.'s L.R. 56(a)1 at 31 ¶ 149; Pl.'s L.R. 56(a)2 at 14 ¶ 149. He also held Series 7, 63, and 65 licenses. Def.'s L.R. 56(a)1 at 31 ¶ 151; Pl.'s L.R. 56(a)2 at 15 ¶ 151. Immediately prior to joining RBS, Van Elswyk worked at Credit Suisse, where he focused on life insurance products, including life settlements. See Def.'s L.R. 56(a)1 at 31 ¶ 152; Pl.'s L.R. 56(a)2 at 15 ¶ 152.

When Van Elswyk began his tenure at RBS, he reported to Miles Hunt and Joe Carney, who worked as Co-Heads of Structuring for the Americas. Def.'s L.R. 56(a)1 at 2 ¶ 4; Pl.'s L.R. 56(a)2 at 1 ¶ 4. In July 2011, Dan McGarvey, Head of Asset Backed Finance and Financial Institution Banking for the Americas, began supervising Van Elswyk as well. Def.'s L.R. 56(a)1 at 2 ¶ 4; Pl.'s L.R. 56(a)2 at 1 ¶ 4. At some point in the latter half of 2011, Hunt was transferred and Van Elswyk began reporting to Robert Fahrbach. See Def.'s L.R. 56(a)1 at 2 ¶ 4; Pl.'s L.R. 56(a)2 at 1 ¶ 4. Van Elswyk's supervisors in turn reported to Scott Eichel, the Head of Global Securities Products and U.S. Credit, as the Insurance Structuring business was within his purview. Def.'s L.R. 56(a)1 at 2 ¶ 5; Pl.'s L.R. 56(a)2 at 1 ¶ 5.

When he began working at RBS, Van Elswyk was required to read and acknowledge receipt of certain internal RBS policies; he did so on April 5, 2011. See Def.'s L.R. 56(a)1 at 2 ¶ 6; Pl.'s L.R. 56(a)2 at 1 ¶ 6. Several of these policies included provisions that, on their face, prohibited employees from sending confidential materials to their personal email addresses or electronic devices. See Def.'s L.R. 56(a)1 at 2–3 ¶¶ 8–10; Pl.'s L.R. 56(a)2 at 2 ¶¶ 8–10.[2] Furthermore, Van Elswyk was required at the end of 2011 to certify his compliance with company policies, including information security policies. See Def.'s L.R. 56(a)1 at 2–3 ¶¶ 7, 11; Pl.'s L.R. 56(a)2 at 2 ¶¶ 7, 11.[3]

---

[2] Van Elswyk says that he does not remember receiving or reviewing these policies and that, as will be discussed in greater detail later in this Ruling, he had permission to send materials to his personal email account. Pl.'s L.R. 56(a)2 at 2 ¶¶ 8–10. However, he does not appear to dispute that he received and acknowledged these documents or to dispute their contents.

[3] Again, Van Elswyck states that he received supervisor approval for his transmission of company materials to his personal email account. See Pl.'s L.R. 56(a)2 at 2 ¶ 11. Notably, according to the parties' Local Rule 56(a) Statements, the annual certification Van Elswyk completed at the end of 2011 required him to certify that "[he] did not forward documentation that contained proprietary information to [his] home PC or any other external device unless [he] received approval of [his] supervisor." Def.'s L.R. 56(a)1 at 3 ¶ 11 (emphasis added) (quoting Motion, Ex. E (Doc. No. 44-8) at 4).

Soon after he began working at RBS, Van Elswyk grew frustrated. He believed that he had been hired to effectuate a type of insurance transaction known as an "XXX" deal, but was unable to get internal approvals for them. See Def.'s L.R. 56(a)1 at 4 ¶ 13; Pl.'s L.R. 56(a)2 at 2 ¶ 13. Though a manager explained to Van Elswyk that the company proceeded cautiously with transactions that might be perceived as particularly risky, Van Elswyk complained to McGarvey that it was "embarrassing to work" at RBS and that he felt "insult[ed] the last couple of months," as the credit group asked him questions that he believed he had already answered. Def.'s L.R. 56(a)1 at 4 ¶ 14; Pl.'s L.R. 56(a)2 at 2 ¶ 14. Van Elswyk's managers suggested that he look for deals apart from the XXX transactions, a point that was stressed in his mid-year review in summer 2011. See Def.'s L.R. 56(a)1 at 4–5 ¶¶ 15–17, 11; Pl.'s L.R. 56(a)2 at 2 ¶¶ 15–17. Van Elswyk believed that the mid-year review unfairly portrayed his work to that point at RBS, specifically because it did not sufficiently underscore the difficulties he had in securing approval for the XXX deals. See Def.'s L.R. 56(a)1 at 5 ¶¶ 18–19; Pl.'s L.R. 56(a)2 at 3 ¶¶ 18–19.

In November 2011, Van Elswyk voiced several of his complaints to his managers and to the Human Resources Department. He suggested that he had been promised both bonus compensation for 2011 and that he would be head of his group, and reiterated his dissatisfaction with being unable to do XXX deals. See Def.'s L.R. 56(a)1 at 5 ¶ 21; Pl.'s L.R. 56(a)2 at 3 ¶ 21. Several human resources employees investigated Van Elswyk's claims and informed him that they found no evidence that he had been guaranteed a bonus for 2011. Def.'s L.R. 56(a)1 at 6 ¶ 22; Pl.'s L.R. 56(a)2 at 3 ¶ 22.

At the end of 2011, McGarvey and Carney met with Van Elswyk to discuss his year-end performance review and to look ahead to 2012. See Def.'s L.R. 56(a)1 at 7 ¶ 25; Pl.'s L.R. 56(a)2 at 3 ¶ 25. Though the parties agree that the meeting was constructive, they dispute the substance of the discussions at this meeting. RBS suggests that Van Elswyk indicated that he understood he needed to broaden his focus beyond the XXX transactions and that Van Elswyk's managers believed he could succeed if he did so. See Def.'s L.R. 56(a)1 at 7 ¶ 25. Van Elswyk, on the other hand, asserts that he was praised for his efforts to generate business, that he should continue work on XXX deals, and that he should prepare three business plans for those deals, each assuming a different risk tolerance on the part of RBS. See Pl.'s L.R. 56(a)2 at 3 ¶ 25.

Van Elswyk received his written year-end review shortly thereafter. The review articulated displeasure with certain of Van Elswyk's work habits, as well as with his pursuit of XXX transactions. See Def.'s L.R. 56(a)1 at 7–8 ¶ 26; Pl.'s L.R. 56(a)2 at 3 ¶ 26; Motion, Ex. S (Doc. No. 44-22) at 2–9.[4] As he did with his mid-year review, Van Elswyk disputed the comments set out in his year-end review, and this time set forth his objections in an email to McGarvey and Carney. See Def.'s L.R. 56(a)1 at 8–9 ¶¶ 27–31; Pl.'s L.R. 56(a)2 at 3–4 ¶¶ 27–31; Motion, Ex. T (Doc. No. 44-23).

Van Elswyk's managers and various HR officials met on February 6, 2012 to decide how they would respond to Van Elswyk's rebuttal to the year-end review. Def.'s

---

[4] Exhibit S, like several others appended to briefing on the Motion, does not contain its own pagination. When citing to such exhibits, the court will use the pagination generated at the top of each page by the CM/ECF filing system. For documents with internal pagination, the court will use those page numbers. The court will not cite to portions of the exhibits by reference to the Bates stamps appearing thereon.

L.R. 56(a)1 at 10 ¶ 33; Pl.'s L.R. 56(a)2 at 4 ¶ 33.  At some point, during that meeting or shortly thereafter, the decision was made to search Van Elswyk's emails.  See Def.'s L.R. 56(a)1 at 10–11 ¶ 34; Pl.'s L.R. 56(a)2 at 4–5 ¶ 34.  When HR employees requested and reviewed Van Elswyk's emails, they saw that he had sent emails from his RBS email address to his personal email account.  Def.'s L.R. 56(a)1 at 11 ¶ 33; Pl.'s L.R. 56(a)2 at 4 ¶ 33.  These emails included presentations on internal strategy and other confidential documents.  Def.'s L.R. 56(a)1 at 11 ¶¶ 35–36; Pl.'s L.R. 56(a)2 at 5 ¶¶ 35–36.[5]

Van Elswyk was notified that RBS was terminating his employment on February 10, 2012.  See Def.'s L.R. 56(a)1 at 11 ¶¶ 35–36; Pl.'s L.R. 56(a)2 at 5 ¶¶ 35–36.

B.    The Ritchie Portfolio: Assets and Accounting

Van Elswyk's allegations in this case center on his claim that he was fired in retaliation for voicing concerns about the way RBS accounted for a group of assets known as the "Ritchie portfolio."  Def.'s L.R. 56(a)1 at 12 ¶ 43; Pl.'s L.R. 56(a)2 at 5 ¶ 43.  The Ritchie portfolio consisted of two insurance-based assets: life settlements and premium financing.  See Def.'s L.R. 56(a)1 at 13 ¶ 46; Pl.'s L.R. 56(a)2 at 6 ¶ 46.  Life settlements are life insurance policies that policyholders sell to third parties, in exchange for a fraction of the death benefit.  The purchaser becomes responsible for continuing premium payments, but receives the benefit upon the death of the insured.  Def.'s L.R. 56(a)1 at 12 ¶ 44; Pl.'s L.R. 56(a)2 at 5 ¶ 44.  On the other

_____

[5] Van Elswyk admits that he sent these emails, with the attachments identified by RBS, from his work to his personal email address, but claims that he had his mangers' permission to do so.  See Pl.'s L.R. 56(a)2 at 5 ¶¶ 35–37.

hand, when a lender loans funds to a person or company to cover the costs of an insurance premium, that arrangement is known as premium financing. In a premium financing, unlike in a life settlement, the policy beneficiary may still receive some of the death benefit if he or she dies before the loan amount reaches a certain amount. Def.'s L.R. 56(a)1 at 12 ¶ 45; Pl.'s L.R. 56(a)2 at 6 ¶ 45.

RBS inherited the Ritchie portfolio when it acquired another bank. Def.'s L.R. 56(a)1 at 13 ¶ 46; Pl.'s L.R. 56(a)2 at 6 ¶ 46. The Ritchie portfolio included four, subsidiary portfolios: AA Genco (the largest, by a substantial margin), PFP1, PFP2, and K1. The entire Ritchie portfolio had a $2.2 billion face value and was accounted for internally at approximately $485 million. AA Genco assets were held in a limited liability company that was, in turn, a wholly owned subsidiary of an RBS offshoot based in the Cayman Islands. See Def.'s L.R. 56(a)1 at 13 ¶ 47; Pl.'s L.R. 56(a)2 at 6 ¶ 47.

The Financial Accounting Standards Board ("FASB") has issued guidance on how to account for life settlement contracts. See generally Motion, Ex. BB ("FSP") (Doc. No. 44-31).[6] Though the particulars of these methods are not important for the purposes of this Ruling, the definitions of each is set out in the margin.[7] Relevant here,

---

[6] Though they vigorously disagree as to how the FSP applies to the facts of this case, neither party appears to dispute that it sets forth the relevant, binding rules for accounting for life settlements. See, e.g., Def.'s L.R. 56(a)1 at 14 ¶ 51; Pl.'s L.R. 56(a)2 at 6 ¶ 51.

The FSP is also available online, at the following URL: http://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1218220136102&acceptedDisclaimer=true (last visited August 2, 2017).

[7] The investment method is defined as follows:

Under the investment method, an investor shall recognize the initial investment at the transaction price plus all initial direct external costs. Continuing costs (policy premiums and direct external costs, if any) to keep the policy in force shall be capitalized. The investor shall not recognize a gain until the insured dies, at which time the investor shall recognize in earnings (or other performance indicators for entities that do not report earnings) the difference between the

investors may "elect to account for its investments in life settlement contracts using either the investment method or the fair value method." See FSP at 2. That selection "shall be made on an instrument-by-instrument basis and is irrevocable." Id. However, when investors choose to account for life settlements by the investment method, they must "test an investment in a life settlement contract for impairment if [they] become[ ] aware of new or updated information that indicates that the expected proceeds from the insurance policy will not be sufficient" to cover various costs. See id. If those costs exceed the expected undiscounted cash inflows from the policy, the investor "shall recognize an impairment loss . . . ." See id. "If an impairment loss is recognized, the investment shall be written down to fair value." Id.

C. Van Elswyk's Allegedly Protected Activities

During his time at RBS, Van Elswyk was familiar with the FSP's allowance for two accounting options for life settlements. See Def.'s L.R. 56(a)1 at 16 ¶ 65; Pl.'s L.R. 56(a)2 at 7 ¶ 65. He learned that RBS had elected to account for the Ritchie portfolio using the investment method, which it was permitted to do at least initially. See Def.'s L.R. 56(a)1 at 16 ¶ 66; Pl.'s L.R. 56(a)2 at 7 ¶ 66. Furthermore, Van Elswyk thought RBS believed it could not change its election of the investment method,

---

carrying amount of a life settlement contract and the life insurance proceeds of the underlying life insurance policy.

FSP at 2. On the other hand, the fair value method is defined as follows:

Under the fair value method, an investor shall recognize the initial investment at the transaction price. In subsequent periods, the investor shall remeasure the investment at fair value in its entirety at each reporting period and shall recognize changes in fair value in earnings (or other performance indicators for entities that do not report earnings) in the period in which the changes occur. The investor should account for premiums paid and life insurance proceeds received on the same financial reporting line as the changes in fair value are reported.

FSP at 2.

because someone who worked in accounting at RBS told him it was an irrevocable election.  See Def.'s L.R. 56(a)1 at 17 ¶ 68; Pl.'s L.R. 56(a)2 at 7 ¶ 68.

The first time Van Elswyk encountered the Ritchie portfolio at RBS was in the summer of 2011, when Eichel and Adam Siegel—one of Eichel's subordinates—asked Van Elswyk for his opinion of the portfolio.  See Def.'s L.R. 56(a)1 at 17 ¶ 70; Pl.'s L.R. 56(a)2 at 8 ¶ 70.  Van Elswyk does not recall the details of this conversation, though he was aware that the Ritchie portfolio was a very large pool and was considered very risky.  See Def.'s L.R. 56(a)1 at 17–18 ¶¶ 71–74; Pl.'s L.R. 56(a)2 at 8 ¶¶ 71–74.

The next conversation Van Elswyk remembers having about the Ritchie portfolio was a discussion about the possibility of Van Elswyk taking responsibility for the Ritchie portfolio.  See Def.'s L.R. 56(a)1 at 18 ¶ 75; Pl.'s L.R. 56(a)2 at 8 ¶ 75.  As he understood it, Van Elswyk would take over the positions from a team sitting in London, and the Ritchie portfolio would have become his "problem."  See Def.'s L.R. 56(a)1 at 18 ¶ 79; Pl.'s L.R. 56(a)2 at 8 ¶ 79.

In early August 2011, Carney emailed Van Elswyk, Hunt, and two members of Van Elswyk's team to tell them that they had been asked to take over the Ritchie portfolio.[8]  See Def.'s L.R. 56(a)1 at 19 ¶ 80; Pl.'s L.R. 56(a)2 at 8 ¶ 80.  Van Elswyk responded that he knew the portfolio well and remarked that the market viewed it as "way over-priced," in part because it included "a lot of policies [that were] worthless or low yielding."  See Def.'s L.R. 56(a)1 at 19 ¶ 81; Pl.'s L.R. 56(a)2 at 8 ¶ 81.  He

---

[8] Van Elswyk admits that the recitation of the facts in this portion of RBS's Local Rule 56(a)1 Statement is true, but claims that he believed at that time that RBS accounted for the Ritchie portfolio using the fair value method.  See Pl.'s L.R. 56(a)2 at 8–9 ¶¶ 81–85.

expressed concern about "inheriting a potentially large loss" and a desire to make sure assumption of the portfolio would "not [ ] affect our group's P/L [profit and loss]." Def.'s L.R. 56(a)1 at 19 ¶ 82; Pl.'s L.R. 56(a)2 at 8 ¶ 82. Nevertheless, Van Elswyk's email made clear that market participants were aware of RBS's pricing, and viewed the portfolio as overpriced. See Def.'s L.R. 56(a)1 at 19 ¶ 83; Pl.'s L.R. 56(a)2 at 8 ¶ 83.

Van Elswyk considered the Ritchie portfolio "toxic or troubled" because of: changed assumptions regarding life expectancy quotes, a lack of updated medical information about the insureds, the risk of fraud, the risk that the underlying insurance policies could be revoked, the minimum cost of insurance that could lead RBS to pay higher premiums as the insureds lived longer, and insurance carrier risks. Def.'s L.R. 56(a)1 at 20 ¶ 87; Pl.'s L.R. 56(a)2 at 9 ¶ 87. In the ensuing month, Van Elswyk conducted research into the Ritchie portfolio and spoke to RBS employees involved in managing the portfolio in the United States and in London. See Def.'s L.R. 56(a)1 at 20 ¶ 89; Pl.'s L.R. 56(a)2 at 9 ¶ 89. Van Elswyk performed such intensive fact-finding in part because RBS's United States arm had never held such a position and had to find a way to account for it. See Def.'s L.R. 56(a)1 at 20 ¶ 90; Pl.'s L.R. 56(a)2 at 9 ¶ 90. He asked for, but never received, the London group's model that had priced the Ritchie portfolio. See Def.'s L.R. 56(a)1 at 20 ¶ 91; Pl.'s L.R. 56(a)2 at 9 ¶ 91.

On September 9, 2011, Hunt forwarded to Van Elswyk an email chain among Hunt, Carney, Kevin Rosema, head of the London insurance trading desk, and Kamil Rybka, a junior trader on the London insurance trading desk. See Def.'s L.R. 56(a)1 at 15, 20 ¶¶ 57, 93; Pl.'s L.R. 56(a)2 at 6, 9 ¶¶ 57, 93. In this chain, Rosema and Rybka suggested that the life settlements were risky and that, if RBS tried to sell the

Ritchie portfolio, they would need to be prepared to recognize significant losses.  See Def.'s L.R. 56(a)1 at 21 ¶¶ 94–95; Pl.'s L.R. 56(a)2 at 9–10 ¶¶ 94–95.

Two weeks later, Ryan Morris, who worked in U.S. Finance, forwarded Van Elswyk an email from Ian Mitchell, who was part of the Chief Accountant's team in London.  See Def.'s L.R. 56(a)1 at 21 ¶ 96; Pl.'s L.R. 56(a)2 at 10 ¶ 96.  Mitchell relayed that he had a telephone call with two technical partners at Deloitte about how RBS should account for the life settlement contracts and sent along his notes from that conversation as well as the email he sent to the Deloitte partners before the call.  See Def.'s L.R. 56(a)1 at 21 ¶ 97; Pl.'s L.R. 56(a)2 at 10 ¶ 97.  In advance of his call, Mitchell had communicated to Deloitte that RBS was thinking (or rethinking) its accounting treatment of the life settlements and that there were divergent views within the company as to how best to do so.  See Def.'s L.R. 56(a)1 at 21–22 ¶¶ 98–99; Pl.'s L.R. 56(a)2 at 10 ¶¶ 98–99.  Though Mitchell's email suggested, at points, that Deloitte acknowledged that the fair value method "[was] only available on initial recognition of the instrument," see Def.'s L.R. 56(a)1 at 22 ¶ 100; Pl.'s L.R. 56(a)2 at 10 ¶ 100, Morris's cover email attributed to Mitchel the view that RBS "should" use the fair value method and that Deloitte "might not be too fussed" about "effectively redesignating something to [fair value]," see Motion, Ex. FF (Doc. No. 44-35) at 1.

On October 13, 2011, Van Elswyk emailed Eichel and Michael Thompson, one of Eichel's subordinates, that he had heard RBS was going to "fair value the [Ritchie] portfolio."  Def.'s L.R. 56(a)1 at 22–23 ¶¶ 102–03; Pl.'s L.R. 56(a)2 at 10 ¶¶ 102–03.  Hours later, Thompson forwarded an email to Van Elswyck and Eichel suggesting that the switch to fair value was "TBD," and could either be in 2011 or in 2015.  See Def.'s

L.R. 56(a)1 at 23 ¶ 105; Pl.'s L.R. 56(a)2 at 10 ¶ 105. Van Elswyk did not assert that

the delay, or any delay in marking down the portfolio's carrying value, was unlawful or

improper. See Def.'s L.R. 56(a)1 at 23 ¶¶ 104, 106; Pl.'s L.R. 56(a)2 at 10 ¶¶ 104, 106.

Ultimately, on December 12, 2011, Rybka emailed Eichel, Van Elswyk, and

others indicating that he had spoken to employees in U.S. Finance who recommended

continuing with the investment method, coupled with annual impairment testing, and

only addressing "reclassification" of the Ritchie portfolio if Deloitte raised it in their year-

end review. See Def.'s L.R. 56(a)1 at 23 ¶ 107; Pl.'s L.R. 56(a)2 at 10 ¶ 107. That

same day, Rybka circulated a memorandum regarding this decision and invited

comments. See Def.'s L.R. 56(a)1 at 23 ¶ 109; Pl.'s L.R. 56(a)2 at 11 ¶ 109. Van

Elswyk did not respond to Rybka, but emailed Carney that he was:

> not comfortable with the below [Rybka's memo]. The technical partners at
> [D]eloitte recommended fv [fair value] and that's all I've seen in my career for LS
> [life settlements]. Their choice to use the investment method is wrong. However,
> [C]arol and her team chose IM [investment method] so I say we just leave it with
> them . . . there's nothing we can do.

Def.'s L.R. 56(a)1 at 24 ¶ 110; Pl.'s L.R. 56(a)2 at 11 ¶ 110. Van Elswyk was aware

that RBS's U.S. Finance team had said it only planned to pursue the investment method

if Deloitte did not raise an issue in their year-end review; he is not aware if Deloitte

ultimately signed off on the investment method as part of an audit. See Def.'s

L.R. 56(a)1 at 24 ¶¶ 114–15; Pl.'s L.R. 56(a)2 at 12 ¶¶ 114–15.

Though Van Elswyk never saw the specifics of the London desk's model for

valuing the Ritchie portfolio, he did an informal fair value calculation of the portfolio.

See Def.'s L.R. 56(a)1 at 25 ¶¶ 116–20; Pl.'s L.R. 56(a)2 at 12 ¶¶ 116–20. He came to

believe that the portfolio was worth $200 or $250 million, which was substantially less

than RBS was booking it at.  See Def.'s L.R. 56(a)1 at 25 ¶ 121; Pl.'s L.R. 56(a)2

at 12 ¶ 121.  Although he does not remember the specifics of any such conversations,

Van Elswyk has testified that he relayed his concerns to Carney, Eichel, and others.

See Def.'s L.R. 56(a)1 at 26 ¶ 122; Pl.'s L.R. 56(a)2 at 12 ¶ 122.

Van Elswyk continued his analysis of the Ritchie portfolio in early 2012,

apparently in preparation for the possibility that his group might take over management

of the portfolio.  See Def.'s L.R. 56(a)1 at 26 ¶¶ 123–24; Pl.'s L.R. 56(a)2 at 12 ¶¶ 123–

24.  In an email he sent on January 18, 2012, Van Elswyk discussed the risks in the

portfolio, concluding that it "[a]ppears we don't have a choice[,] but we need air cover on

this big time and to get paid."  See Def.'s L.R. 56(a)1 at 26–27 ¶ 127; Pl.'s L.R. 56(a)2

at 12 ¶ 127.  In that same email, however, he lamented that the Ritchie portfolio "has at

least 300mln of losses which are going to be triggered either this year by the auditors

(who've advised [C]arol and Scott to move this to fair value but they ignored that

advice)" or by RBS selling the portfolio in 2013.  See Motion, Ex. LL (Doc. No. 44-41)

at 2.

In the give and take regarding compensation issues surrounding Van Elswyk's

group's possible assumption of responsibility for the Ritchie portfolio, Eichel proposed

that the bonus pool could be paid as a flat fee, rather than being based on the

performance of the portfolio.  See Def.'s L.R. 56(a)1 at 27 ¶ 131; Pl.'s L.R. 56(a)2

at 13 ¶ 131.  This assuaged Van Elswyk's fears "from a manager's perspective," see

Def.'s L.R. 56(a)1 at 27 ¶ 132, though he maintains that it did not rectify what he

perceived as problems in the accounting methodology, see Pl.'s L.R. 56(a)2

at 13 ¶ 132.

Shortly thereafter, at the end of January 2012, Van Elswyk reviewed a report prepared by the actuarial firm Towers Watson, which analyzed RBS's impairment model for the AA Genco portfolio.  See Def.'s L.R. 56(a)1 at 28 ¶¶ 135–36; Pl.'s L.R. 56(a)2 at 13 ¶¶ 135–36.  The Towers Watson report analyzed RBS's model's assumptions as well as a variety of risk factors, including life expectancy estimates, mortality, and servicing costs.  See Def.'s L.R. 56(a)1 at 28–29 ¶¶ 137–38; Pl.'s L.R. 56(a)2 at 13 ¶¶ 137–38.  Van Elswyk did not put any stock in the Towers Watson report, because he believed there was not "any analysis" in the report, "they're not a credit risk shop, [and] they're not a litigation shop."  See Def.'s L.R. 56(a)1 at 29 ¶ 140; Pl.'s L.R. 56(a)2 at 14 ¶ 140.

In the end, the Ritchie portfolio was never moved to Van Elswyk's management.  See Def.'s L.R. 56(a)1 at 28 ¶¶ 133–34; Pl.'s L.R. 56(a)2 at 13 ¶¶ 133–34.  In his two-page, February 3, 2012 email, see Motion, Ex. T at 1–2, designed to rebut his year-end performance review, Van Elswyk briefly spoke to the alleged issues with RBS's valuation of the Ritchie portfolio, see Def.'s L.R. 56(a)1 at 30 ¶¶ 141–43; Pl.'s L.R. 56(a)2 at 13 ¶¶ 141–43.  In a paragraph addressing "Customers Expectations," Van Elswyk noted the carriers with whom he had worked, including: "Silverpoint Capital (legacy XXX securitization unwinds, de-risking opportunities for the AA Genco and PFP1 positions which have an embedded 300mln+ loss in them although not recorded on RBS' financials) . . . ."  Motion, Ex. T at 2.

As discussed above, see supra Part II.A, Van Elswyk was terminated shortly thereafter.

D.     Procedural History

After he was terminated, Van Elswyk filed a FINRA arbitration claim against RBS.

See Def.'s L.R. 56(a)1 at 32 ¶ 154; Pl.'s L.R. 56(a)2 at 15 ¶ 154.  The FINRA panel did

not award Van Elswyk any of his claimed damages, see Def.'s L.R. 56(a)1 at 32 ¶ 159;

Pl.'s L.R. 56(a)2 at 15 ¶ 159, but it recommended changing the "Termination

Explanation" on his U-5 Form to "Terminated at will," see Motion, Ex. UU (Doc. No. 44-

50) at 2.

On June 20, 2012, Van Elswyk filed a complaint with the Occupational Safety

and Health Administration ("OSHA") claiming that he was fired in violation of SOX's

whistleblower protections.  See Def.'s L.R. 56(a)1 at 32 ¶ 160; Pl.'s L.R. 56(a)2 at 16

¶ 160.

## III.   LEGAL STANDARDS

A.     Motions for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a movant is entitled to

summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  The "court must determine 'whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.'"  Kulak v. City of New York, 88 F.3d 63, 70–71 (2d

Cir. 1996) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986)).  "On

a motion for summary judgment, the court must resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is

sought."  Reyes v. Lincoln Auto. Fin. Servs., 861 F.3d 51, 54 (2d Cir. 2017) (quotation

marks and citation omitted).  Nevertheless, the nonmoving party may not defeat the motion by offering "conclusory statements, conjecture, or speculation . . . ."  See Kulak, 88 F.3d at 71 (citing, inter alia, Wyler v. United States, 725 F.2d 156, 160 (2d Cir. 1983)).  "In deciding a summary judgment motion, a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."  See Victory v. Pataki, 814 F.3d 47, 59 (2d Cir. 2016) (quotation marks and citation omitted).

B.  Sarbanes-Oxley and Dodd-Frank

In relevant part, the Sarbanes-Oxley Act provides that:

No company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee . . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of [f]ederal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A(a)(1)(C) ("Section 1514A").  Van Elswyk's Dodd-Frank claim is coextensive with his SOX claim: the claims rise or fall together.  See 15 U.S.C. § 78u-6(h)(1)(A)(iii) (prohibiting adverse employment actions against employees who "mak[e] disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 . . .");  Mem. in Opp'n at 8 ("If the [c]ourt determines that Van Elswyk's SOX claim survives for trial, then so too must his Dodd-Frank claim . . . .");  Reply at 1 n.1 ("Van Elswyk concedes that if his SOX claim fails, his Dodd-Frank claim also fails." (citing Mem. in Opp'n at 8)).

Section 1514A is "intended to 'protect[ ] employees when they take lawful acts to disclose information or otherwise assist in detecting and stopping actions which they reasonably believe to be fraudulent.'" <u>Nielsen v. AECOM Tech. Corp.</u>, 762 F.3d 214, 218 (2d Cir. 2014) (quoting <u>Bechtel v. Admin. Review Bd.</u>, 710 F.3d 443, 446 (2d Cir. 2013)). "To prevail on a claim of retaliation pursuant to [Section] 1514A, the plaintiff must show that: (1) he or she engaged in a protected activity; (2) the employer knew that he or she engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." <u>Id.</u> at 219 (quotation marks and citation omitted). An employee engages in protected activity when he or she "provide[s] information" regarding an activity that he or she "reasonably believes constitutes a violation of" the enumerated statutory and regulatory provisions in Section 1514A. <u>See</u> 18 U.S.C. § 1514A(a)(1)(C),

Even if the plaintiff can establish each of these four elements, "the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." <u>Bechtel</u>, 710 F.3d at 447 (quoting <u>Harp v. Charter Commc'ns, Inc.</u>, 558 F.3d 722, 723 (7th Cir. 2009)).

## IV.    DISCUSSION

RBS argues that it is entitled to summary judgment on six grounds. Specifically, RBS contends that Van Elswyk cannot demonstrate: (1) a subjectively genuine belief of a SOX-enumerated violation; (2) an objectively reasonable belief of a SOX-enumerated violation; (3) that he "provided information" about the conduct; (4) that RBS had knowledge of a protected activity; and (5) that the protected activity was a contributing

factor in his termination.  <u>See</u> Reply at 1 n.1.  Last, RBS argues (6) that the undisputed

facts demonstrate by "clear and convincing evidence that RBS would have terminated

Van Elswyk's employment notwithstanding any protected activity."  <u>Id.</u>  Notably, RBS

does not dispute that Van Elswyk has provided evidence to satisfy the third element of a

prima facie SOX retaliation claim: that he suffered an unfavorable employment action.

<u>See</u> <u>Nielsen</u>, 762 F.3d at 219.

The court will take up RBS's arguments in turn.

A.    <u>Protected Activity</u>

As noted above, an employee engages in protected activity when he provides

information regarding conduct that he reasonably believes constitutes a violation of

certain statutes and regulations identified in Section 1514A.  <u>See</u> 18 U.S.C.

§ 1514A(a)(1)(C).  "A reasonable belief contains both subjective and objective

components."  <u>Nielsen</u>, 762 F.3d at 221.  That is to say, the plaintiff must demonstrate

"both a subjectively genuine and objectively reasonable belief" that the activity violated

a provision listed in Section 1514A.  <u>See</u> <u>Trusz v. UBS Realty</u>, No. 3:09–cv–268 (JAM),

2016 WL 1559563, at *6 (D. Conn. Apr. 18, 2016) (citing, <u>inter</u> <u>alia</u>, <u>Wiggins v. ING U.S.,</u>

<u>Inc.</u>, No. 3:14–cv–1089 (JCH), 2015 WL 8779559, at *4 (D. Conn. Dec. 15, 2015)).

Though there is certainly overlap between RBS's arguments about the subjective

and objective prongs of the "reasonable belief" requirement and regarding whether Van

Elswyk "provided information" within the meaning of Section 1514A, <u>see</u> Mem. in Supp.

at 20–24 (failing to separate discussion of these issues), the court will address each

separately.

1.     Subjectively Genuine Belief of SOX-Enumerated Violations

After reviewing the parties' submissions, it is evident that Van Elswyk can point to evidence from which a jury could conclude that he had a subjectively genuine belief that RBS's accounting practices ran afoul of provisions identified in Section 1514A.

For example, Van Elswyk unequivocally stated during his deposition that he was concerned that the decision to continue with the investment method, as communicated by Rybka in December 2011, could be "illegal."  See Opp'n, Ex. A at 239:7.  Van Elswyk said he "truly believed that the trading desk was making a conscious decision to use an inappropriate accounting method," see id. at 239:2–239:4, in which case, if RBS employees "sign[ed] a financial statement knowing that [they were] mismarking [their] position, depending upon the facts and circumstances, it could be fraud . . . ," see id. at 239:10–239:13.  At base, therefore, whether Van Elswyk can prove this component of his SOX claim to a jury will likely turn on how credible the jury finds him.  By contrast, in ruling on a motion for summary judgment, "the court cannot properly make credibility determinations . . . ."  See Soto v. Gaudett, 862 F.3d 148, 2017 WL 2854323, at *5 (2d Cir. July 5, 2017).

None of RBS's arguments to the contrary are persuasive.  To the extent that other portions of Van Elswyk's deposition testimony undercut his stated belief that RBS's accounting practices might constitute fraud, see, e.g., Reply at 4 ("Indeed, Van Elswyk does not dispute that, at the time of his alleged protected activity, he believed that the reason RBS did not change the accounting treatment was that RBS's accountants actually believed that the election was irrevocable."), it is for the jury to

determine the appropriate weight, if any, to give Van Elswyk's testimony insofar as it may be argued it is internally inconsistent.

Therefore, the court denies RBS's Motion for Summary Judgment, to the extent it suggests Van Elswyk has not demonstrated a triable issue of fact as to his subjective, genuine belief that RBS was engaged in SOX-enumerated violations.

### 2.    Objectively Reasonable Belief of SOX-Enumerated Violations

RBS also argues that, based on the undisputed material facts, Van Elswyk did not have an "objectively reasonable belief that RBS was violating" a SOX-enumerated statute or regulation.  See Mem. in Supp. at 20.  Van Elswyk disagrees, arguing that, at the very least, "reasonable minds could accept Van Elswyk's good faith view that RBS's failure to properly report the value of the [Ritchie] [p]ortfolio violated SEC regulations or misled the firm's shareholders . . . ."  See Mem. in Opp'n at 12.  Notwithstanding RBS's assertions to the contrary, the court agrees with Van Elswyk: there remains a triable fact issue as to whether Van Elswyk's alleged belief that RBS's conduct violated one of the SOX-enumerated provisions was objectively reasonable.

"The objective prong of the reasonable belief test focuses on the 'basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience.'"  Nielsen, 762 F.3d at 221 (quoting Sharkey v. J.P. Morgan Chase & Co., 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011)).  Of course, "[m]any employees are unlikely to be trained to recognize legally actionable conduct by their employers."  Id.  As several circuit courts have made clear, "[i]f reasonable minds could disagree on this issue, the objective reasonableness of an employee's belief should not be decided as a matter of law . . . ."  Allen v. Admin. Rev. Bd., 514 F.3d 468, 477–78 (5th Cir. 2008)

(citing <u>Lipphardt v. Durango Steakhouse of Brandon, Inc.</u>, 267 F.3d 1183, 1188 (11th Cir. 2001); <u>Fine v. Ryan Int'l Airlines</u>, 305 F.3d 746, 752–53 (7th Cir. 2002)).

At the outset, the court rejects RBS's argument, <u>see</u> Mem. in Supp. at 19–20, that Van Elswyk is limited to the Section 1514A's sixth, catchall category, which references "any provision of [f]ederal law relating to fraud against shareholders . . . ," <u>see</u> 18 U.S.C. § 1514A(a)(1)(C).  As Van Elswyk points out, <u>see</u> Mem. in Opp'n at 13 n.4, the accounting practices he flagged might be viewed as giving rise to a reasonable belief that RBS violated "any rule or regulation of the Securities and Exchange Commission . . . ," the fifth category set out in Section 1514A, <u>see</u> 18 U.S.C. § 1514A(a)(1)(C).  RBS does not press this point in its Reply brief.[9]

The core of RBS's argument that it is entitled to summary judgment on the objective reasonableness prong is its position that the FSP prohibited it from changing the way it accounted for the Ritchie portfolio to fair value.  Any reasonable person with Van Elswyk's experience and expertise would have known as much, they argue.  <u>See, e.g.</u>, Mem. in Supp. at 21 (suggesting that Van Elswyk knew of the FSP and "concede[d]" that RBS could use investment method).  RBS suggests that there is a distinction between the FSP's requirement "writ[ing] [a life settlement] down to fair value" when the holder of a life settlement takes an impairment and switching to the "fair value method."  <u>See</u> Reply at 2 ("Nothing in FTB 85-4-1 [FSP] required RBS to change

---

[9] In any event, Van Elswyk might well successfully invoke the sixth, catchall category, referencing "any provision of [f]ederal law relating to fraud against shareholders . . ."  See 18 U.S.C. § 1514A(a)(1)(C).  Given the communications with Deloitte of which Van Elswyk was aware, a jury could conclude that he had an objectively reasonable belief that RBS acted with the requisite scienter related to fraud against shareholders, when it actively chose not to switch accounting methods despite an understanding by some RBS employees that Deloitte would not be "too fussed," <u>see</u> Motion, Ex. FF (Doc. No. 44-35) at 1, about such a switch.  <u>But see</u> Mem. in Supp. at 20 (arguing to the contrary).

its accounting method going forward upon taking an impairment.").  Whether or not RBS's semantic parsing of the FSP is accurate, the court cannot conclude that the FSP is so free from ambiguity that no reasonable person with Van Elswyk's knowledge would have thought RBS was not required to switch its accounting method or, more to the point, that it was prohibited from doing so.  See generally Motion, Ex. BB (FSP).  Van Elswyk, at least, has testified that he believed exactly that, and the court does not believe that his testimony is fanciful or so unworthy of belief that a jury could not conclude from his testimony that an objectively reasonable actor would think the same.

To the same point, RBS selectively cites from the emails Van Elswyk received from his coworkers regarding their correspondence with Deloitte.  Notwithstanding Van Elswyk's experience with life insurance financial products, Deloitte was presumably the expert in the accounting treatment that should be given to life settlements.  And, upon review of the email Van Elswyk received on September 23, 2011, see generally Motion, Ex. FF (Doc. No. 44-35), the court simply does not agree that it undermines Van Elswyk's claims in the way RBS suggests.  All of the information Van Elswyk received about these conversations was third-hand: Ian Mitchell told Ryan Morris, who in turn told Van Elswyk, what Deloitte had said.  See id.  Though at one point Mitchell indicated that "designat[ing] [life settlement contracts] at fair value through P&L . . . [was] only available on initial recognition of the instrument," see id. at 3, Morris elsewhere relayed Mitchell's belief that Deloitte "might not be too fussed" about making such a change, see id. at 1.  The question before the court is not whether RBS actually could adjust its valuation of the Ritchie portfolio in the way Van Elswyk believes they should have.  Instead, it is whether an objectively reasonable person in Van Elswyk's position could

have believed that RBS was violating SEC rules or violating laws related to securities or shareholder fraud.  The conflicting messages in the September 23, 2011 email preclude the court from accepting RBS's invitation to determine that a reasonable jury would find objectively unreasonable Van Elswyk's suggestion that RBS "had received contrary advice from its auditors, Deloitte" and that it "deliberately and knowingly ignored that advice."  <u>See</u> Reply at 3 (citing Mem. in Opp'n at 1, 4, 9, 10, 11, 13, 17).

Relatedly, Van Elswyk was not required to offer evidence that "auditors took issue with the approach [maintaining the investment method] during their audit."  <u>See</u> Reply at 3.  It is sufficient that there is a triable issue of fact as to whether a reasonable person in Van Elswyk's position would have concluded that RBS was violating SEC rules (presumably those regarding accounting practices) and/or misleading shareholders.

It bears noting that the court expresses no view as to whether Van Elswyk's evidence is likely to convince a jury to find in his favor.  RBS's arguments outlined above, as well as those that the court has not addressed above, <u>see, e.g.</u>, Mem. in Supp. at 22 (suggesting no reasonable person would think RBS was violating United States law, because Ritchie portfolio was managed in London); Mem. in Supp. at 23 (noting that Van Elswyk believed market viewed portfolio as overpriced, undermining claim reasonable person would believe RBS was misleading public); Reply at 5 (contending no reasonable person would have concern about SOX-enumerated violations without viewing model and in face of Towers Watson report), may well persuade a jury.  However, none of the undisputed issues RBS points to are so conclusive as to permit the determination that no reasonable jury could find that an

objectively reasonable person would maintain a belief—even if erroneous—of SOX-enumerated violations. Objective reasonableness is an issue ill-suited, in most cases, to resolution by the court on a motion for summary judgment. See Allen v. Admin. Rev. Bd., 514 F.3d 468, 477–78 (5th Cir. 2008) ("If reasonable minds could disagree on this issue, the objective reasonableness of an employee's belief should not be decided as a matter of law . . . ." (citations omitted)).

RBS's Motion for Summary Judgment is denied insofar as it suggests that Van Elswyk cannot demonstrate an objectively reasonable belief of SOX-enumerated violations.

### 3. Provision of Information Regarding SOX-Enumerated Violations

The last component of "protected activity" is the provision of information regarding SOX-enumerated violations. Once again, RBS suggests that summary judgment should be granted in its favor on this point. See Reply at 6–9.

As RBS points out, however, see Mem. in Supp. at 21, the "critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law," Nielsen, 762 F.3d at 221 (emphasis added) (quoting Villanueva v. U.S. Dep't of Labor, 743 F.3d 103, 109 (5th Cir. 2014)). "That is, the employee must provide factually specific information to the employer regarding conduct [he] believes to be illegal; it is not necessary for the employee to cite to a specific code section [he] believes was violated." Barker v. UBS AG, 888 F. Supp. 2d 291, 297 (D. Conn. 2012) (citing Welch v. Chao, 536 F.3d 269, 276 (4th Cir. 2008)).

In this case, Van Elswyk communicated with a variety of RBS employees over an extended period of time regarding his views on the accounting treatment of life

settlements.  For example, in December 12, 2011, Van Elswyk responded to Rybka's statement that they would stick with the investment method by alerting Carney that he thought this choice was "wrong," in part because "[t]he technical partners at [D]eloitte recommended fv [fair value] . . . and that's all [he had] seen in [his] career for LS [life settlements."  See Motion, Ex. JJ (Doc. No. 44-39) at 1.  RBS boldly states that these statements are "a far cry from alerting an employer to a suspected fraud or securities violation," see Reply at 6 (quotation marks and citation omitted), but ignores the fact that in sending that message to Carney, Van Elswyk provided factually specific information regarding conduct that he (allegedly) reasonably believed violated SOX-enumerated provisions, namely a violation of a rule or regulation of the SEC or a violation of federal law relating to fraud against shareholders.

Similarly, in an email sent on January 18, 2012 to Carney, McGarvey, and Fahrbach, Van Elswyk commented that the Ritchie portfolio "ha[d] at least 300mln of losses which are going to be triggered either this year by the auditors (who've advised [C]arol and Scott to move this to fair value but they ignored that advice) or by [ ] selling it in 2013 as Scott mentioned."  Motion, Ex. LL (Doc. No. 44-41) at 2.  To be sure, there is discussion in this email about Van Elswyk's desire to ensure he gets paid, see Reply at 7 (citing Fraser v. Fiduciary Tr. Co. Int'l, No. 01–cv–6958 (PAC), 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009)), but such comments do not remove the preceding language in which Van Elswyk asserted that RBS was ignoring Deloitte.  They certainly do not so undermine his earlier comment as to render it insufficient as a matter of law.

Finally, RBS spills substantial ink explaining why the court should disregard Van Elswyk's description of the AA Genco and PFP1 positions as "hav[ing] an embedded

300mln+ loss in them although not recorded on RBS' financials . . . ." See Reply at 7–9 (quoting Motion, Ex. T at 2).  The court does not agree with RBS that Van Elswyk's "managers certainly would not have read this as a concern about fraud or misleading RBS's shareholders."  See id. at 9.  It seems quite likely that anytime managers in the financial industry receive reports of losses "not recorded" on financial statements, their antennae go up.  Moreover, the context in which this comment was offered—in the middle of a fairly dense, two-page email, see Reply at 7–8—relates to the effectiveness with which Van Elswyk communicated the information, rather than whether the email is evidence that Van Elswyk "provided information."

Ultimately, Van Elswyk has pointed to evidence that he identified to several of his managers the conduct that he now claims gave rise to a reasonable belief of violations of SOX-enumerated provisions.[10]  In doing so, he has identified sufficient facts to create a triable issue as to whether he "provide[d] information" to RBS within the meaning of Section 1514A.[11]  To the extent RBS's Motion for Summary Judgment argues to the contrary, it is denied.

Having rejected all of RBS's arguments regarding the three components of the "protected activity" element of a SOX claim, the court will turn next to RBS's arguments

---

[10] To the extent RBS urges the court to grant judgment in its favor on the grounds that the conduct Van Elswyk reported was an "accounting 'error,' without more . . . ," see Mem. in Supp. at 23–24, the court disagrees: knowingly misstating the value of a company's assets on required financial filings, as Van Elswyk claims RBS did, is more than a mere "accounting error."

[11] Nor does Section 1514A appear to contain any requirement that, to "provide information" within the meaning of the statute, Van Elswyk must have raised an issue of which RBS was not already aware. Though RBS appears to suggest the opposite, see Mem. in Supp. at 23 (claiming that RBS workers in London were "aware of all of the risks that Van Elswyk thought were inherent in the Ritchie portfolio, prior to Van Elswyk raising any of these purported risk"), they offer no legal support for this reading of Section 1514A.

that summary judgment is appropriate because it "did not have knowledge of SOX-protected activity." See Mem. in Supp. at 24.

B.    Knowledge of the Protected Activity

In three, brief sentences, RBS argues that summary judgment should be granted in its favor because it did not have knowledge of SOX-protected activity. See Mem. in Supp. at 24 ("In none of [Van Elswyk's] communications did [he] remotely suggest that RBS could be committing a fraud or violating any sort of U.S. law."). This argument is a weak one. The court has concluded that there remain sufficient issues of fact as to preclude summary judgment as to the reasonable belief or "provided information" prongs of the first element of Van Elswyk's SOX claim. RBS does not argue—nor could it—that its employees did not know of the contents of his emails; indeed, those emails were sent to Van Elswyk's managers. At base, this portion of RBS's brief appears to be an attempt to relitigate the "provided information" prong of the first element of Van Elswyk's SOX claim. See Mem. in Supp. at 24 (suggesting Van Elswyk's "managers at most had knowledge that [he] disagreed with the choice to use the investment method and that he believed that this method overstated the value of the Ritchie portfolio"). The court has rejected those arguments already. See supra Part IV.A.3. In the absence of any independent argument that RBS did not have knowledge of the protected activity, because, for example, Van Elswyk had not shared his concerns with his supervisors, see Mem. in Supp. at 24 n.11 (citing Folger v. Simplexgrinnell, LLC, ARB Case No. 15-021, ALJ Case No. 2013-SOX-42, 2016 WL 1014052 (Feb. 18, 2016)), the court denies summary judgment on this basis.

C.    Protected Activity as a Contributing Factor in an Adverse Personnel Action

As for the fourth element of Van Elswyk's SOX retaliation claim, RBS contends that his "reports were not a contributing factor in his termination." See Mem. in Supp. at 25–27. Once more, RBS asks the court to weigh the evidence itself and intrude upon the function of the jury.

In order to prevail on his SOX claim, Van Elswyk needs to prove that "circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." Barker v. UBS AG, 888 F. Supp. 2d 291, 299–300 (D. Conn. 2012) (quoting Vodopia v. Koninklijke Philips Elecs., N.V., 398 F. App'x 659, 662 (2d Cir. 2010) (summary order)). "A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." Id. (quoting Klopfenstein v. PCC Flow Techs. Holdings, Inc. & Parrott, ARB Case No. 04-149, 2006 WL 1788436, at *13 (May 31, 2006)). However, the protected activity need not be "the primary motivating factor" in the adverse employment action; nor does the plaintiff need to demonstrate that "the employer's articulated reason [for the personnel action] was pretext in order to prevail." Id. (citing Klopfenstein, 2006 WL 1788436, at *13; Halloum v. Intel Corp., ARB Case No. 04-068, 2006 WL 618383, at *6 (Jan. 31, 2006)).

First, RBS argues that Van Elswyk's claim is "fatally flawed," because the questions he raised had been "discuss[ed] . . . for months prior to Van Elswyk's rebuttal email." See Mem. in Supp. at 25. This argument is meritless, as the jury could conclude that Van Elswyk's repeated remarks about the Ritchie portfolio's overvaluation

were a "contributing factor" in his termination, notwithstanding any other discussions that were occurring or had occurred among other employees.[12]

RBS also suggests that the temporal proximity between Van Elswyk's February 3, 2012 rebuttal email and his termination on February 10, 2012 "is inadequate to establish causation, particularly where other evidence militates against a causation finding." See Mem. in Supp. at 26. Though RBS has certainly pointed to evidence from which a jury could find that Van Elswyk's "negative attitude and inability to focus on anything beyond the XXX transactions," see id., were the sole factors that led to his firing, the jury could also conclude that his persistence in criticizing the accounting treatment accorded to the Ritchie portfolio was a "contributing factor" in his termination.

RBS further argues that any temporal proximity between Van Elswyk's February 3, 2012 email and his firing on February 10, 2012 is so undermined as to permit summary judgment because he "is unable to point to any evidence to suggest that his managers were upset that he raised questions about the accounting treatment for the life settlement portfolios." Id. at 26. This line of reasoning ignores the fact that almost immediately after Van Elswyk sent his rebuttal email, his managers and HR officials decided to search his emails. From this, a reasonable jury could infer that Van Elswyk's supervisors were upset that he kept bringing up the accounting treatment of the Ritchie portfolio and that they sought a reason to terminate Van Elswyk's

_____

[12] Once more, this argument appears to be based, in part, on RBS's contention that they cannot be liable for SOX retaliation if they were already aware of the alleged violations about which Van Elswyk complained. They offer no case law to support this position. See supra n.11. In fact, retaliation seems all the more likely where an employee's supervisors are aware of fraudulent conduct and have either taken no action or actively participate in it. Shielding the employer from liability in such a case, as RBS seems to invite the court to do, appears squarely at odds with the text and purpose of Section 1514A.

employment.  Indeed, the jury could conclude that, whatever positive reactions Van

Elswyk may have received via return email, are more than outweighed by the

indisputable fact that he was fired following his February 3, 2012 email.[13]  To be clear,

this is far from the only conclusion the jury could reach: they could deem this temporal

proximity a coincidence or attribute the decision to search Van Elswyk's email to

unhappiness with his refusal to turn away from the XXX transactions.  What is clear,

however, is that there remain fact issues to be resolved by a jury.

Finally, RBS suggests that Van Elswyk's allegedly protected activity was not a

contributing factor in his termination, as a matter of law, because other employees

"raised the same issues" and did not suffer adverse employment actions.  <u>See</u> Mem. in

Supp. at 27.  Even crediting RBS's statement that other employees expressed concern

about the valuation of the portfolio, Van Elswyk has suggested that these

communications differed from his own, in that they were "focused on the potential sale

of the [Ritchie] [p]ortfolio and not merely a change in accounting method" or that they

raised "substantially different concern[s]" from his own.  <u>Compare</u> Def.'s L.R. 56(a)1

at 30–31 ¶¶ 144–48, <u>with</u> Pl.'s L.R. 56(a)2 at 14 ¶¶ 144–48.  After reviewing the record,

<u>see, e.g.</u>, Motion, Ex. PP, the court is not persuaded that Van Elswyk's efforts to

distinguish the contexts in which other RBS employees made skeptical remarks about

the valuation of the Ritchie portfolio are so fallacious that no reasonable jury could credit

---

[13] Though the court's discussion here focuses on the temporal proximity between Van Elswyk's February 3, 2012 email and his February 10, 2012 firing, the court does not believe that Van Elswyk could not also offer his earlier emails to support his claim.  This does not appear to be a case in which a plaintiff relies on "temporal proximity, without more," <u>see</u> Mem. in Supp. at 26 & n.12 (collecting cases from United States District Court for the Southern District of New York and United States Department of Labor), to prove that his protected activities were a contributing factor in an adverse personnel action. Rather, the totality of Van Elswyk's emails, coupled, for example, with RBS's decision to search his emails, renders summary judgment inappropriate on this ground.

them.  Instead, it will be for the jury to decide whether they are, in fact, distinguishable and what weight to give their findings on this point.

Because the undisputed facts in this case do not establish, as a matter of law, that Van Elswyk's alleged SOX-protected communications were not a contributing factor in his termination, RBS is not entitled to summary judgment on this basis.

D.    Evidence that Termination Would have Occurred in the Absence of Protected Activity

Finally, RBS's contends that summary judgment is proper because it "can 'clearly and convincingly demonstrate' that it would have terminated Van Elswyk's employment under the circumstances, whether or not he engaged in protected activity, for sending confidential and proprietary RBS documents to his personal email account in violation of RBS policy."  See Mem. in Supp. at 27–28.  This argument is entirely unpersuasive, because several issues of fact remain with regard to RBS's offered and actual justifications for firing Van Elswyk.

Most obviously, though RBS says in this portion of its brief that it fired Van Elswyk because he violated their information security policy, see id. at 28, Van Elswyk has repeatedly countered that he had permission to use his work and personal email accounts in the ways he did, see, e.g., Pl.'s L.R. 56(a)2 at 5 ¶¶ 35–39; Mem. in Opp'n at 20; Opp'n, Ex. A (Doc. No. 51-1) at 73:7–73:14 ("[W]hen I was hired and then throughout my employment there, I was allowed to work from home and had authorization to send e-mails and documents to my home e-mail address.").  Relatedly, the jury could conclude, as Van Elswyk argues it should, see Mem. in Opp'n at 20, that RBS employees decided to search his emails because he complained in his February 2012 email about the accounting treatment applied to the Ritchie portfolio.  If the jury so

concluded, it could find that the information security violations flagged by RBS were a pretextual justification for Van Elswyk's firing.

These factual disputes preclude summary judgment in RBS's favor: the undisputed evidence most certainly does not demonstrate "clearly and convincingly" that he would have been fired irrespective of the alleged protected activity.

## V. CONCLUSION

In sum, RBS's Motion for Summary Judgment (Doc. No. 44) is **DENIED**.  RBS has failed to carry its burden of establishing that the undisputed material facts demonstrate that they are entitled to judgment as a matter of law.  Because Van Elswyk's SOX claim survives this ruling, his Dodd-Frank claim does as well.

To be clear, the court expresses no view as to whether the jury will or should find in Van Elswyk's favor on the elements of his SOX claim.  Indeed, the jurors might well be convinced, for example, that Van Elswyk did not harbor an objectively reasonable belief that SOX-enumerated provisions were violated or that, even if he engaged in protected activity, such activity was not a contributing factor in his termination. Regardless of the strengths or weaknesses of Van Elswyk's claims, and RBS's defenses thereto, the factual disputes that remain in this case must be decided by a jury, not by the court.  It is for that reason that summary judgment is improper on the bases RBS has put forth.

**SO ORDERED.**

Dated at New Haven, Connecticut this 9th day of August, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge